**C O N F I D E N T I A L**
PROPERTY OF U.S. COURTS.

This document is not to be disclosed to any
party not officially involved in the pre and
post sentencing aspects of this case without
approval of the Court, Rule 32 (e)

**SD/FL PACTS #114902**

Pursuant to the U.S. Supreme Court decision in **U.S. v Booker**, 125 S.Ct. 738(2005), the sentencing guidelines presented herein are advisory and not binding on the Court.

## UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) **PRESENTENCE INVESTIGATION REPORT** |
| | ) |
| | ) |
| **v.** | ) **Docket No.  113C 9:13CR80054** |
| | ) **Defendant No. 002** |
| **TARA JO MOORE** | ) **Guidelines Manual: 2014** |

---

**Prepared for:**     The Honorable Kenneth A. Marra

U.S. District Judge

**Prepared by:**     Frances  Weisberg

U.S. Probation Officer

Flagler Center Building

501 South Flagler Drive, Suite 400

West Palm Beach, FL 33401

561-804-6899

Frances_Weisberg@flsp.uscourts.gov

**Assistant U.S. Attorney**

Lothrop  Morris

500 South Australian Avenue, Suite 400

West Palm Beach, FL 33401

561.820.8711

lothrop.morris@usdoj.gov

**Defense Counsel**

Peter  Patanzo

1 Financial Plaza

Suite 1615

Fort Lauderdale, FL 33394

954.779.1700

ppatanzo@bellsouth.net

**Sentence Date:**     January 23, 2015, West Palm Beach, FL

**Offense:**          <u>Counts 1-2</u>:
Sex trafficking of a minor
18 U.S.C. § 1591(a)(1),(b)(2)
10 years to life imprisonment, 5 years to life supervised release,
$250,000 fine, and $100 special assessment
(Class A Felony)

<u>Count 3</u>:
Conspiracy to engage in sex trafficking of a minor
18 U.S.C. § 1594(c)
Any term of years or life imprisonment, 5 years to life supervised
release, $250,000 fine and $100 special assessment
(Class A Felony)

**Arrest Date:**      2/20/2013

**Release Status:**   Held in pretrial detention since her arrest/U.S. Marshals Service

**Detainers:**        None

**Codefendants:**

Dontavious          11/06/2013:  Found guilty by a jury trial of Counts One through
Mingel Blake:       Three
Pacts#114901        01/23/2015:  Scheduled sentencing date

**Related Cases:**

12-80151-CR-Middlebrooks/Southern District of Florida

**Date Report Prepared:**                    **Date Report Revised:**
         12/16/2014

**Identifying Data:**

| | |
|---|---|
| **Date of Birth:** | November 2, 1987 |
| **Age:** | 27 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Female |
| **SSN#:** | 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 |
| **FBI#:** | 503391RC0 |
| **USM#:** | 02732-104 |
| **State ID#:** | FL 06780482 |
| **ICE#:** | Not applicable |



Tara Moore
SDFL PACTS 114902

| | |
|---|---|
| **Other ID#:** | FL DL#M600-810-87-902-0 |
| **Education:** | Some middle school |
| **Dependents:** | Three children |
| **Citizenship:** | U.S. Citizen |

| | |
|---|---|
| **Legal Address:** | Palm Beach County Jail |
| | 3228 Gun Club Road |
| | West Palm Beach, FL 33406 |

**Alias(es):**

| | |
|---|---|
| Names: | Tara Moore |
| | Tara J. Moore |
| | |
| DOBs: | November 2, 1982 |

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.  **On November 5, 2014, a Rule 29 motion (motion for acquittal) was granted as to Counts Four through Six. On November 6, 2014, the defendant was found guilty by a jury as to Counts One through Three of a six-count Superseding Indictment. Counts One and Two charge her with sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1),(b)(2). Count Three charges her with conspiracy to engage in sex trafficking of minors, in violation of 18 U.S.C. § 1594(c).**

2.  There is no plea agreement in this case.

### Related Cases

3.  Frank Joseph Smith was charged in a one-count Indictment in Docket No. 12-80151-CR-Middlebrooks, with production of child pornography, in violation of 18 U.S.C. § 2251(a). On October 24, 2012, Smith pled guilty to the one-count Indictment. On January 3, 2013, he was sentenced to 240 months imprisonment, life supervised release and a $100 special assessment. An order of restitution was denied. The circumstances of his case are outlined in the offense conduct section.

### The Offense Conduct

4.  In July 2012, the National Center for Missing and Exploited Children (NCMEC) forwarded a Cyberline Tip Report to agents identifying a Backpage ad depicting an unknown white female, utilizing telephone number 305-900-9369. The ad was reported to Backpage.com as depicting a minor or child under the age of eighteen. NCMEC identified an Internet Protocol (I.P.) address and email address associated with the ad. The email address, snowbunny561@hotmail.com, was queried against social networking sites such as Facebook and Myspace by NCMEC. A Facebook account belonging to **Tara Jo Moore**, in West Palm Beach, Florida, was located. Further, a Myspace account was located associated with Dontavious Mingel Blake.

5.  E.P. was 16 years old when she first engaged in prostitution for Blake and Moore. E.P. found a business card belonging to Blake in approximately September or October of 2010. E.P. called the phone number listed on the card and spoke to Blake. After speaking on the phone, Blake came to E.P.'s mother's house, where he and E.P. met. Blake explained his business to E.P. and that he posted girls online for prostitution services. Blake explained that girls made a minimum of $200 for each out-call. E.P. had not posted herself online prior to meeting Blake. E.P. told Blake that she would get back in touch with him. The next time E.P. met

4

Blake, E.P. went to Blake's house that he shared with his girlfriend, later determined to be **Moore**. During this meeting, Blake took pictures of E.P. and posted her online on Backpage.com. Blake used his phone to take pictures. E.P. believed Blake saved the pictures of each girl and reused them to post newer ads on Backpage. Initially, E.P. did not receive phone calls, but soon thereafter, she received calls and went out on out-calls for prostitution. **Moore** answered the phones when the prospective johns, or clients, called, negotiated the prices and scheduled the prostitution calls. When E.P. first began working for Blake and **Moore**, the calls were done in hotels around the West Palm Beach area, including the Best Western on Palm Beach Lakes Boulevard and the Holiday Inn on Belvedere Road. Blake paid for the hotel rooms using a credit card. **Moore** and Blake picked up E.P. from her mother's home in Lake Worth, Florida. E.P. had been in juvenile commitment programs.

6.      E.P. and the other girls working for Blake and **Moore** had to pay half of the proceeds from each prostitution call back to Blake and **Moore** and half of the costs of the hotel room. Pricing for the calls were as follows: $120 for 30 minutes or $180 to $200 for a full hour. On occasion, Blake and **Moore** rented hotel rooms and scheduled girls for in-calls at the hotel, where sometimes up to three girls shared the room. If the room was being used for a call, the other girls went to the lobby or pool until the call was over. E.P. believed Blake and **Moore** used the proceeds to pay for their living expenses. There were approximately eight girls working for Blake and **Moore** at most times.

7.      Blake and **Moore** also had a townhouse located off Village Boulevard in West Palm Beach where prostitutes working for them could live and stay. Blake and **Moore** charged girls $20 per day during the week to stay at the townhouse and $30 per day during the weekend. E.P. had stayed there from time to time but did not like it because "basers" or crack-head girls stayed there. The townhouse was equipped with cameras. Blake would call the girls at the townhouse on the girls' cellular phones, tell them the time and location of the call and would come pick them up if it was an out-call. It was normal to see girls using illegal drugs at the townhouse. E.P. did not like being around girls doing hard drugs. Blake knew people that sold various drugs and got drugs for the girls.

8.      One of the girls in the townhouse, "Steph" or Stephanie LNU, was badly addicted to drugs, spent all of her money on pills, paid $20 a pill and then had to work all day to make money to pay for the drugs. Many of the girls in the townhouse were addicted to drugs and found themselves with no money after paying half of their money to Blake, paying to stay at the townhouse and paying for drugs.

9.      Cassandra Fisher lived in the townhouse and was a "baser" or crack-head. She also worked for Blake and **Moore** as a prostitute.  Fisher also collected money from the prostitutes, answered calls, and scheduled prostitution calls on behalf of Blake and **Moore**.

10.     E.P. worked for Blake and **Moore** from approximately September 2010 through February 2012.  She quit working for Blake and **Moore** when she was 17 years old in December 2011 after she got into a car accident and injured herself.  E.P. began having problems with her mother around the time she turned 18 years old and started working for Blake and **Moore** again. According to the government, Blake had sexual intercourse with E.P. over a long period of time when she was a minor and after she turned 18 years old.

11.     As far as operations of the escorts, normally Blake and **Moore** sent the girl depicted in the ads when "johns" or "customers" called for dates or appointments. **Moore** answered the phone and talked with the customers. If the girl in the ad was busy for some reason, **Moore** was good at finessing the customer and telling the customer, while pretending to be the girl in the ad, that she was busy but that she had a cute friend she could send.

12.     Another minor, B.H., was a childhood friend of E.P. B.H. also worked as a prostitute while she was a minor for Blake and **Moore** for a brief period; however, B.H. was too much trouble. Blake told E.P. that he did not want B.H. calling him anymore or anything to do with her.

13.     In August 2012, agents interviewed juvenile T.H., in a separate investigation relating to the production of child pornography. During the course of the interview, T.H. revealed that she first engaged in prostitution at the age of 15 during the summer of 2011. T.H. had approximately 10 to 15 regular clients or "johns" and worked in hotels in the Palm Beach County area.  During that time, T.H. worked for Blake and **Moore**.  **Moore** answered phones and calls, negotiated prices and scheduled prostitution and escort calls. Blake and **Moore** had four to five girls working as prostitutes out of hotels in the Palm Beach County area. T.H. and her friend E.P. worked for Blake and **Moore** during the same time period. E.P. introduced T.H. to Blake and **Moore**. T.H. had run away from her mother's residence because she did not want to go to the Kelly Center (a substance abuse treatment center). E.P. introduced T.H. to Blake and **Moore** when T.H. was living on the streets.

14.     T.H. and E.P. went to the Holiday Inn on Belvedere and Blake picked up both girls. After picking them up, Blake took the girls back to the apartment he shared with **Moore**.

15.     Blake advised T.H. to charge $120 per date for sex with the clients; however, T.H. often charged $200 to cover additional money that she was required to pay to Blake.  T.H. and E.P kept a portion of the proceeds from the calls or "dates" and a portion of the proceeds were paid to Blake and **Moore**.  While working with Blake, T.H. worked out of hotels in the West Palm Beach area including the Best Western located off of Palm Beach Lakes Boulevard, the La Quinta Inn on Okeechobee Boulevard and the Red Roof Inn on 45th Street. T.H. worked under the name, "Heather" with ads posted on Backpage.com. In the photographs for the ads, E.P. took the photographs of T.H. where her face was not seen or visible and then sent the photographs to Blake via text message. Blake then posted the ads with the photographs on Backpage. To arrange dates, Blake posted a phone number in the ad that belonged to him or **Moore**. Once a prospective client made contact over the phone with Blake or **Moore**, T.H. was contacted by Blake and told of the date. Blake then picked up T.H. and drove her to and from the date. Blake also reserved the hotel rooms for the dates. T.H. paid half the costs of the hotel room back to Blake from the proceeds of the prostitution activities.

16.     During the entire time T.H. worked for Blake, E.P. also worked for him. E.P. and T.H. had calls or dates together. T.H. and E.P. took pictures of themselves and sent the pictures to Blake to be used in the online postings. On one occasion, Blake hired a professional photographer to take photographs of the girls dressed in bras and panties.

17.     Blake provided drugs to the girls working for him on occasion and also supplied condoms for the girls from time to time.  T.H. saw **Moore** approximately two to three times per month for the entire length of time T.H. worked for Blake and **Moore**.

18.     **Moore** told T.H. that if T.H. was nice to the clients or johns, the clients would buy things for her and take her places. While T.H. worked for Blake and **Moore**, **Moore** answered phone calls from the prospective johns, typed the posts or ads that were placed on Backpage and on occasion, rented hotel rooms in **Moore**'s name. T.H. recalled in one instance, **Moore** rented the room or rooms at the La Quinta Inn located on Okeechobee Boulevard for prostitution calls. On another occasion, **Moore** walked T.H. to the hotel room door for prostitution out-call.

19.     Blake and **Moore** were aware of T.H.'s age at the time T.H. began working for them. T.H. told both individuals that she was 15 years old. In addition, T.H. believed E.P. also told Blake and **Moore** of T.H.'s age. Blake and **Moore** told T.H. to tell the other girls working for them and johns that she was over 18 years old.

20.     Blake and **Moore** also both purchased cigarettes for T.H. and E.P. at convenience stores on various occasions as both girls were under 18 and could not purchase cigarettes for themselves. T.H. did not like it when **Moore** purchased the cigarettes because **Moore** only bought the type of cigarettes she smoked herself.

21.     **Moore** and T.H. smoked marijuana together on **Moore**'s birthday and T.H. had also taken "beans," or ecstasy, with **Moore**. **Moore** had also brought an eight ball of cocaine to T.H. at a hotel. T.H. purchased cocaine, marijuana, and Xanax from Blake.

22.     T.H. met Frank Joseph Smith through Backpage.com. Smith responded to T.H.'s advertisement, and the two met for the first time in approximately August 2011. The first time T.H. and Smith met was at the Best Western Hotel. During the first few dates T.H. had with Smith, they hung out and smoked marijuana but did not have sex. During Smith's first three dates with T.H., Smith paid T.H. $150 each time for the date. Smith and T.H. had sex on the fourth time they met and during that encounter, Smith wore a condom. Thereafter, Smith did not use condoms during his sexual encounters with T.H. Smith paid T.H. an extra $200 in addition to the $150 on dates when the two had sex. In November 2011, T.H. told Smith her true age of 15.  T.H. quit working for Blake when she eventually went into the Kelly Center for substance abuse treatment.

23.     Heaven Leigh Siegel graduated from high school in 2011. Siegel was approached by **Moore** at a gas station who asked if she wanted to make some money as a prostitute and handed Siegel her phone number.  Siegel told **Moore** that she was not interested.   Siegel later called **Moore** to ask about purchasing marijuana. **Moore** and Blake took Siegel to purchase marijuana also went to a hotel where they met a prostitute working for **Moore** and Blake.  While at the hotel, Blake was on the computer doing something with Backpage and **Moore** explained to Siegel how Backpage worked.  **Moore** again asked Siegel if she wanted to make extra money by working for them, and Siegel declined.

24.     Later, Siegel called **Moore** and told her that she was interested in working for her and Blake.  **Moore** told Siegel to come meet with her and Blake and they would explain things. Siegel met Blake and **Moore** and they created a Backpage ad for Siegel, including taking photographs of her, selecting a name to pose under, setting up prices, in-calls versus out-calls, and headings for the ad. Half of the proceeds from the calls was paid to **Moore** and Blake and Siegel kept the remaining half. Siegel's ads were always posted with **Moore**'s telephone number. On Siegel's first call **Moore** answered the call and negotiated with the "john" for an out-call at the man's home in Wellington.  Thereafter, Siegel went out every night and worked for **Moore** and Blake after working at Jimmy Johns during the day.

25.     **Moore** and Blake provided Xanax at no charge.  **Moore** and Siegel became close friends, and Siegel lost contact with her friends and family.  When Siegel was doing calls in the hotel rooms, she and **Moore** hung out in the rooms between calls. Siegel was the only girl working for Blake and **Moore** for a period of time. Thereafter, Blake and **Moore** began operating Diamond Dolls Escorts.

26.     Siegel witnessed E.P. doing prostitution calls at the La Quinta Inn located on Palm Beach Lakes Boulevard in West Palm Beach.  Siegel told **Moore** and Blake that E.P. was sixteen years old at one point and cautioned them regarding her age.

27.     Khrystyna Trejo's sister has three children with **Moore**'s brother. As soon as **Moore** found out about Trejo's prior arrest for prostitution, **Moore** told Trejo that she could work for **Moore** and Blake.  **Moore** explained that she and Blake paid for half of the hotel rooms and that she would have to pay her and Blake half of the money from each prostitution call.  Trejo started working for **Moore** and Blake and posted her own Backpage escort ads using her cellular telephone, photographs of herself from her Facebook page, and photographs from the Internet. Trejo began posting ads because she needed money. Trejo used drugs including Xanax or "z bars" and Dilaudid.

28.     Trejo knew two underage girls, E.P. and T.H., worked for Blake and **Moore**. T.H. told Trejo she was 18 years old, but Trejo did not believe her. T.H. friend requested Trejo on Facebook, and Trejo's belief that T.H. was young was confirmed when she saw T.H.'s Facebook information showing T.H. was in high school. While working for Blake and **Moore**, Trejo shared a hotel room with T.H. and E .P. T.H. and E.P. were watching Phineas and Ferb cartoons on the television while in the hotel room. Trejo confronted T.H. about her age.  T.H. asked Trejo not to saying anything to Blake and **Moore** about her age because they told her not to tell anyone that she was a minor.  Trejo went to Blake and **Moore** and told each of them that the two girls were minors and that they were going to get in trouble. Blake told Trejo to "shut the fuck up" and to "mind her own fucking business." On one occasion, E.P. slipped up and told Trejo that she was sixteen years old. Trejo recalled that T.H. had run away from a Department of Juvenile Justice program. Trejo told **Moore** about E.P. revealing that she was 16 years old.   According to the government, Trejo collected money from the prostitutes, including the minors, on behalf of Blake and **Moore**.

29.     Kimberly B. Tompkins was a patient at a substance abuse treatment program called CARP in West Palm Beach, Florida in 2012. Tompkins and another woman, Michelle LNU, received a day pass from the CARP facility. The two women were at the Sunoco gas station on 45th Street when they were approached by Blake. Blake handed the women a business card advertising an escort service. Tompkins and Michelle LNU left the gas station and went to the Winn Dixie down the street to get money orders. While at the Winn Dixie, they called Blake and

asked Blake if he could get them "blues," or oxycodone. Blake came to the Winn Dixie and picked up the two women. Also in the car with Blake was a black male who worked at CARP named Chris Coleman. Tompkins recognized Coleman from CARP, and Tompkins and Michelle LNU told Blake that they were out on a day pass from CARP. Blake drove to a location near the railroad tracks and got "blues" for Tompkins and Michelle LNU. Tompkins did not take the pill immediately but carried it back to CARP with her and took it there.

30.     Blake drove Tompkins, Michelle LNU, and Coleman to his townhouse. Tompkins believed there was a camera on the landing of the stairs and another one at the top of the stairs. The cameras were monitored, and a male would stay in the coat room or closet to keep an eye on things. The male in the coat closet was described as a short, fat black male, approximately 5'6" to 5'7". Blake charged the girls to stay at the townhouse and they were expected to tip out the male in the coat closet/room with money they earned from prostitution. Blake took pictures of Michelle LNU and Tompkins.  Michelle LNU and Fisher smoked crack in the bathroom. While they were in the bathroom, Tompkins drank a beer. With the exception of taking a Tylenol 3 while at CARP, Tompkins had been sober prior to drinking the beer at the townhouse.  Blake eventually drove Tompkins and Michelle LNU back to CARP.

31.     Tompkins had not engaged in prostitution or escorting prior to becoming involved with Blake. She had worked at adult clubs including Flashdance, Wild West, and Paper Moon but did not engage in prostitution. Tompkins stayed at the townhouse for less than a week after getting kicked out of CARP. While living there, she worked as a prostitute for Blake. Tompkins estimated that she had between three and seven dates.

32.     Kristen Lauren Cashwell was also at CARP in August or September of 2012 recovering from a serious drug addiction to OxyContin.  Cashwell was introduced to Blake and **Moore** through Tompkins while both women were patients at CARP. Cashwell had been in CARP for approximately three months before meeting Blake and **Moore** and had been successful in her sobriety until she met Blake and **Moore**. The first time Tompkins met Blake, Cashwell was not with Tompkins. Tompkins came back to CARP with oxycodone, and Cashwell and Tompkins split the pill. After that, Cashwell, Tompkins, and Lindsey Brennon left CARP for a period of time and met up with Blake.  Blake took them all to the townhouse.

33.     Blake had a person bring oxycodone over to the townhouse for Cashwell and Tompkins. They took the pills.  Tompkins and Cashwell went back to CARP and were kicked out because of their drug use.  After being kicked out of CARP, Tompkins and Cashwell were desperate and had no place to go.

34. Blake offered to let them stay at the townhouse. A black male known only by the nickname "Bug" often stayed at the townhouse. "Bug" was a drug dealer who sold crack cocaine and oxycodone. In addition, other dealers came by the townhouse from time to time to sell to the girls. Wayne LNU was paid to stay at the townhouse and watch the cameras and the girls who were living there. Girls hung out at the townhouse, and besides clients or johns, the only males allowed at the townhouse were the ones described above. All of the girls living at the town house were prostitutes and had severe drug addictions. Cashwell lived at Blake and **Moore**'s townhouse for a period of time. It was understood that the only way to stay at the townhouse was to work for Blake and **Moore** and do prostitution calls. Pictures of Cashwell were taken at Blake and **Moore**'s apartment in Tiffany Lakes. Cashwell worked for Blake and **Moore** and engaged in prostitution.

35. Blake dealt directly with the girls at the townhouse. **Moore** did not deal with the girls at the townhouse. **Moore** talked to clients on the phone. After getting paid for calls, the girls took the money to one of the guys watching the cameras at the townhouse. On occasion, Cashwell collected the money and gave it to Blake.

36. On February 19, 2013, a criminal complaint was filed and arrest warrants were issued for Blake and **Moore**. The warrants were executed on February 20, 2013.

37. After his arrest, Blake attempted to obstruct the investigation by directing an individual to communicate with one of the minor victims and have her tell authorities that she lied and told Blake that she was overage. He further requested that the minor victim tell authorities that she showed him a state card, that being fake identification.

**Role Assessment**

38. Dontavious Blake and **Tara Jo Moore** jointly ran a prostitution business and are equally culpable.  They recruited females to work as prostitutes, directed their activities, rented hotel rooms for the prostitutes and provided transportation for the prostitutes. **Moore** primarily answered phones, negotiated prices, and scheduled prostitution and escort calls. Blake primarily collected the money from the prostitution business. Blake and **Moore** were both involved in taking pictures of the prostitutes and posting ads on Backpage for their prostitution business. Blake and **Moore** both purchased cigarettes for the minors T.H. and E.P at convenience stores on various occasions. **Moore** and Blake also provided Xanax at no charge. Blake had sexual intercourse with minor E.P. on multiple occasions, provided drugs to the girls working for him on occasion and also supplied condoms for the girls from time to time. Based on their roles as an organizer or leader of a criminal activity involving five or more participants or that was otherwise extensive, a four level role enhancement is recommended for both Blake and **Moore**, § 3B1.1(a).

11

39.    According to the government, several prostitutes worked at the direction of Blake and **Moore** including Khrystyna Trejo, Heaven Leigh Seigel, Kimberly B. Tompkins, Cassandra Fisher, and Kristen Lauren Cashwell. Trejo and Cashwell also collected money from the prostitutes, including the minors, on behalf of Blake and **Moore**. Fisher also collected money from the prostitutes, answered phones, and scheduled prostitution calls on behalf of Blake and **Moore**.

40.    "Bug" and Wayne LNU either collected money from the prostitution business, provided security or watched the cameras at the townhouse at the direction of Blake and **Moore**. Neither an aggravating nor mitigating role adjustment is recommended.

**<u>Victim Impact</u>**

41.    The provisions of 18 U.S.C. § 1953 and the Mandatory Victim Restitution Act of 1996 (18 U.S.C. § 3663A) apply to this Title 18 offense. The victims have been identified as T.H. and E.P. Pursuant to 18 U.S.C. § 1953(b)(3), the defendant is required to pay any victim the full amount of their losses as defined in 18 U.S.C. 2259(b)(3), which includes any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense. Pursuant to 18 U.S.C. §§ 1951(b)(2) and 3663A(d), an order of restitution shall be issued and enforced in accordance with 18 U.S.C. § 3664. According to the Federal Bureau of Investigation, they are working with T.H. and E.P. in preparing a victim impact statement and determining if restitution is applicable, and will provide the statement to the Court prior to sentencing. Pursuant to 18 U.S.C. § 3664(d)(5), if the victims' losses are not ascertainable by the date that is ten days prior to sentencing, the attorney for the government or the probation officer shall so inform the Court, and the Court shall set a date for the final determination of the victims' losses, not to exceed 90 days after sentencing.

**<u>Adjustment for Obstruction of Justice</u>**

42.    The probation officer has no information indicating the defendant impeded or obstructed justice.

**<u>Adjustment for Acceptance of Responsibility</u>**

43.    The defendant proceeded to trial and put the government to its burden of proving her guilty. As of the completion of this report, the defendant has not provided a statement for acceptance of responsibility. Accordingly, a reduction for acceptance of responsibility is not appropriate.

### Offense Level Computation

44.    The defendant was convicted of Counts One through Three. Counts One and Two charge sex trafficking of a minor, in violation of 18 U.S.C. § 1591(a)(1),(b)(2). Count Three charges conspiracy to engage in sex trafficking of minors, in violation of 18 U.S.C. § 1594(c). The guideline for these counts is found in § 2G1.3. In accordance with the special instruction in subsection (d)(1) in § 2G1.3, because the case involved more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the persuasion, enticement, coercion, travel, or transportation to engage in a commercial sex act or prohibited sexual conduct of each victim had been contained in a separate count of conviction. Accordingly, Count Three(A) represents the conspiracy to engage in the sex trafficking of T.H. Count Three(B) represents the conspiracy to engage in the sex trafficking of E.P. Count One is the substantive sex trafficking count involving T.H. Count Two is the substantive sex trafficking count involving E.P. Count Three(A) is grouped with Count One, pursuant to § 3D1.2(b), and shall constitute Group One. Count Three(B) is grouped with Count Two, pursuant to § 3D1.2(b), and shall constitute Group Two.

45.    According to § 3D1.1(a)(3), the Court shall determine the combined offense level applicable to all groups taken together by applying the rules in § 3D1.4. The combined offense level is determined by taking the offense level applicable to the group with the highest adjusted offense level and increasing that adjusted offense level by the appropriate number of levels, in accordance with the units assigned, as reflected in the table provided in § 3D1.4.

### Group One: Sex trafficking of T.H.

46.    **Base Offense Level:** The guideline for 18 U.S.C. § 1591(a)(1) offenses is found in § 2G1.3 of the guidelines. That section provides that an offense involving sex trafficking of a minor has a base offense level of 30 if the defendant was convicted of 18 U.S.C. § 1591(b)(2), § 2G1.3.                                                    **30**

47.    **Specific Offense Characteristics:** Since the minor was otherwise in the custody, care, or supervisory control of the defendant, the offense level is increased by two levels, § 2G1.3(b)(1)(B).                                                              **+2**

48.    **Specific Offense Characteristics:** Since a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct, the offense level is increased by two levels, § 2G1.3(b)(2)(B).                                              **+2**

49. **Specific Offense Characteristics:** Since the offense involved the use of a computer or an interactive computer to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, the offense level is increased by two levels, § 2G1.3(b)(3)(B).     **+2**

50. **Specific Offense Characteristics:** Since § 2G1.3(a)(3) or (a)(4) applies and the offense involved a commercial sex act, the offense level is increased by two levels, § 2G1.3(b)(4)(B).     **+2**

51. **Victim Related Adjustment:** None     **0**

52. **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added, § 3B1.1(a).     **+4**

53. **Adjustment for Obstruction of Justice:** None     **0**

54. **Adjusted Offense Level (Subtotal):**     **42**

**Group Two**: Sex trafficking of E.P.

55. **Base Offense Level:** The guideline for 18 U.S.C. § 1591(a)(1) offenses is found in § 2G1.3 of the guidelines. That section provides that an offense involving sex trafficking of a minor has a base offense level of 30 if the defendant was convicted of 18 U.S.C. § 1591(b)(2), § 2G1.3.     **30**

56. **Specific Offense Characteristics:** Since the minor was otherwise in the custody, care, or supervisory control of the defendant, the offense level is increased by two levels, § 2G1.3(b)(1)(B).     **+2**

57. **Specific Offense Characteristics:** Since a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct, the offense level is increased by two levels, § 2G1.3(b)(2)(B).     **+2**

58. **Specific Offense Characteristics:** Since the offense involved the use of a computer or an interactive computer to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, the offense level is increased by two levels, § 2G1.3(b)(3)(B).     **+2**

59. **Specific Offense Characteristics:** Since § 2G1.3(a)(3) or (a)(4) applies and the offense involved a commercial sex act, the offense level is increased by two levels, § 2G1.3(b)(4)(B).     **+2**

60. **Victim Related Adjustment:** None     **0**

61.   **Adjustment for Role in the Offense:** The defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; therefore, four levels are added, § 3B1.1(a).   **+4**

62.   **Adjustment for Obstruction of Justice:** None   **0**

63.   **Adjusted Offense Level (Subtotal):**   **42**

64.   **Multiple Count Adjustment:**

| Group # | Adjusted Offense Levels | Units |
|---------|-------------------------|-------|
| 1 | 42 | 1.0 |
| 2 | 42 | 1.0 |

Total Number of Units:   2.0

65.   **Greater of the Adjusted Offense Levels Above:**   **42**

66.   **Increase in Offense Level:**   **2**

67.   **Combined Adjusted Offense Level:**   **44**

68.   **Chapter Four Enhancement:** Since the offense of conviction is a covered sex crime, § 4B1.1 (Career Offender) and § 4B1.5(a) do not apply, and the defendant engaged in a pattern of activity involving prohibited sexual conduct, that being, sex trafficking of minors, the offense level is increased by five levels, § 4B1.5(b)(1).   **49**

69.   **Acceptance of Responsibility:** As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense, § 3E1.1.   **0**

70.   **Total Offense Level:** Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.   **43**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

71.   None

**Adult Criminal Conviction(s)**

| | Date of Arrest | Charge/Agency | Date Sentence Imposed/Disposition | Guideline | Points |
|---|---|---|---|---|---|
| 72. | 05/22/2008 (Age 20) | Possession of Marijuana Under 20 Grams/ Sheriff's Office, Palm Beach County, FL | Docket No.: 2008-MM-010782 09/08/2008: Adjudication withheld, costs | 4A1.1(c) | 1 |

According to the arrest report, on May 22, 2008, an officer observed the defendant standing in the passenger door of a vehicle smoking an object. The officer made contact with the defendant, who attempted to conceal the object on the seat. The officer observed a half smoked marijuana cigarette on the seat and smelled an odor of marijuana. As the officer recovered the marijuana cigarette, the defendant uttered, "That's my stuff." The defendant was advised she was under arrest for possession of marijuana. She was subsequently processed at the scene and released.

| | Date of Arrest | Charge/Agency | Date Sentence Imposed/Disposition | Guideline | Points |
|---|---|---|---|---|---|
| 73. | 08/31/2009 (Age 21) | Operating While Driver's License Suspended, Canceled or Revoked/ Sheriff's Office, Palm Beach County, FL | Docket No.: 2009-CT-029412 11/16/2009: Adjudicated guilty, time served (2 days), costs | 4A1.2(c)(1) | 0 |

According to court records, on August 31, 2009, the defendant received a citation for the above charge. On October 21, 2009, a warrant was issued after she failed to appear for court. She was arrested on November 15, 2009 and sentenced to time served the following day.

| | | | | | |
|---|---|---|---|---|---|
| 74. | 06/23/2010 (Age 22) | Ct. 1: Operating While Driver's License Suspended, Canceled or Revoked Ct. 2: Unregistered Motor Vehicle Ct. 3: Attaching Tag (License Plate) Not Assigned/ Sheriff's Office, Palm Beach County, FL | Docket No.: 2010-CT-019395 09/14/2010: Cts. 1-3, Adjudicated guilty, time served (2 days), costs | 4A1.2(c)(1) | 0 |

According to court records, on June 23, 2010, the defendant was issued citations for the above charges. She was also charged with not showing proof of insurance which was later dismissed. On July 14, 2010, a warrant was issued after she failed to appear for court. She was arrested on September 13, 2010, and sentenced to time served the following day.

| | | | | | |
|---|---|---|---|---|---|
| 75. | 09/13/2010 (Age 22) | No Valid Driver's License/ Sheriff's Office, Palm Beach County, FL | Docket No.: 2010-CT-028320 11/01/2010: Adjudicated guilty, costs | 4A1.2(c)(1) | 0 |

According to court records, on September 13, 2010, the defendant received a citation for the above charge.

| | | | | | |
|---|---|---|---|---|---|
| 76. | 05/18/2012 (Age 24) | Ct. 1: No Driver's License - Never Had One Issued Ct. 2: Speeding State Posted/ Sheriff's Office, Palm Beach County, FL | Docket No.: 2012-CT-013146 06/19/2012: Cts. 1-2, Adjudicated guilty, costs | 4A1.2(c)(1) | 0 |

According to court records, on May 18, 2012, the defendant was issued a citation for the above charges.

### Criminal History Computation

77. The defendant has a total of one criminal history point. According to the sentencing table in Chapter 5, Part A, one criminal history points establish a criminal history category of I.

### Other Criminal Conduct

| No. | Date of Arrest | Charge | Agency | Disposition |
|---|---|---|---|---|
| 78. | 05/12/2007 (Age 19) | Domestic Battery | Sheriff's Office, Palm Beach County, FL | Docket No.: 2007-MM-009497 05/29/2007: No File |

According to the arrest report, on May 12, 2007, an officer responded in reference to a domestic call. Upon arrival, the officer observed the defendant and Nicholas Valverde arguing in the middle of the street. The officer separated both parties and attempted to speak to Valverde at which point the defendant began uttering, "Yeah I hit him in the face, he pissed me off." Valverde denied that the defendant struck him. The officer observed that Valverde had a bloody mouth and asked him about it. Valverde advised his lip was bloody because he worked construction. The officer spoke again with the defendant, who stated that she punched and slapped Valverde in the face and that he never hit her. The defendant also advised that she and Valverde lived together in the past and that they had a child in common. Valverde refused to write a witness statement or allow the officer to take a photograph of his injuries.

### Pending Charges

79.   None

### Other Arrests

80.   None

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

81.   The defendant was interviewed on November 19, 2014, at the Palm Beach County Jail in West Palm Beach, Florida. Her family and social information was verified by her mother on December 12, 2014, unless otherwise noted.

82.   According to her birth certificate, the defendant was born on November 2, 1987, in Sullivan County, Tennessee to the union of Terry Joe Moore and Sonya Lee Light. The defendant's parents were married and eventually separated due to her father's prescription drug addiction. The defendant's father committed suicide by hanging himself in a jail cell after his arrest in 1999 at age 31.

83.  The defendant's mother, age 52, resides at 31 Susan Circle, Lake Worth, Florida and is employed in the housekeeping department at a medical center. She is presently married to Bartell Downs, age 52. He works at a car auction. The defendant's mother is aware of her charges and has remained supportive.

84.  The defendant has two maternal half siblings. Gypsy Brooks, age 30, resides in West Palm Beach, Florida and is unemployed. Damon Brooks, age 29, resides in Rogersville, Tennessee and is a factory worker.

85.  The defendant has two full siblings. Jonathan Moore, age 25, resides in Lake Worth, Florida and is a chef. Dakota Moore, age 22, resides in Lake Worth, Florida and works at a car wash.

86.  The defendant has never been married and has three children. The defendant has one child, Christian Valverde, age 11, who was born from a relationship with Nicholas Valverde, age 29. The defendant's son was born with congenital abnormalities. The defendant resided with Nicholas Valverde for the first six years of Christian's life. After their relationship ended, they maintained joint custody and both took care of the financial responsibility of their child. The defendant's son has been residing with his father in West Palm Beach, Florida since her arrest. According to criminal records, the defendant was arrested for domestic battery in 2007, in which Nicholas Valverde was the alleged victim. That case later resulted in no charged being filed (see Docket No. 2007-MM-009497).

87.  The defendant has one child, Aaliyah Lott, age four, who was born from a relationship with Teremun Lott, age 40. According to Palm Beach County, Florida child support enforcement records, Teremum Lott was court ordered to pay $285 per month in child support in Docket No. 2010DR700283. The defendant's daughter resided with the defendant until her arrest. Her daughter is presently temporarily residing with Teremun Lott's sister in West Palm Beach, Florida.

88.  The defendant has maintained a serious relationship with the codefendant, Dontavious Blake, since 2011. She described their relationship as "dysfunctional." She indicated he was physically abusive, was involved in other sexual relationships during their union, and was manipulative. Blake was also found guilty at trial and is pending sentencing in the instant offense. One child, Dontavious Blake, Jr., age two, was born a result of their relationship. Since their arrest, their son has resided with his paternal grandmother, Nancy Anderson, in West Palm Beach, Florida.

89.  The defendant resided in Tennessee from 1987 to 1991. In 1991, she moved to Florida with her mother and siblings. In approximately 1999, she and her brother, Dakota, went to Tennessee to see their father. Within weeks of their visit, their

father committed suicide.  The defendant and her brother subsequently returned to Florida to reside with their mother.  The defendant indicated she moved out of her mother's residence in 2001, when she was 14 years old, to live with her boyfriend at that time. The defendant returned to live with her mother in 2005 for one year but has since lived on her own.

90.   For approximately one year before her arrest, the defendant resided in a two bedroom, one bathroom rental apartment located at 801 West Tiffany Drive, #2, Magnolia Park, Florida. She resided with her boyfriend and children.   The defendant and her boyfriend are both incarcerated.   Since their arrest, the defendant's mother has removed all of the belongings from their apartment and put them in storage.  As a result, a home visit was not conducted.

### Physical Condition

91.   The defendant is a white, non-Hispanic female who stands five feet eight inches, weighs 140 pounds and has brown hair and blue eyes.  She has the following tattoos:  a joker on her right forearm with the phrase "go getta"; a bunny with the word "playgirl" on the right side of her neck; her son's first name "Christian" on the left side of her neck; a tribal tattoo and a picture of a man and woman on the center of her back;  a picture of the state of Florida on the top of her right foot; the money sign and "MOB" on her left hip; and a pit bull on her right hip. She has a scar on her left ankle from a car accident in 2008 in which she shattered her ankle and had screws and metal plates inserted.  She indicated she was supposed to have the screws and metal plates removed years ago.

92.   The defendant is healthy and has no history of health problems. This information was corroborated by her mother.

### Mental and Emotional

93.   The defendant stated she never received any counseling after her father's suicide. She felt she could have benefited from counseling and indicated that no one wanted to talk about it.  However, according to the defendant's mother, both the defendant and her brother, Dakota, attended grief counseling for a couple of months after their father committed suicide.

94.   The defendant reported she was sexually abused by her mother's boyfriend when she was 12 or 13 years old and that he made her touch his private area on at least two occasions.  She indicated she told her mother about the abuse and that her mother initially did not believe her.   The defendant then told her maternal grandmother, who intervened and made sure that he was no longer a part of the defendant's life.   The abuse was never reported to law enforcement.   This

information was corroborated by the defendant's mother, who confirmed the defendant never received counseling as a result of the sexual abuse.

95. The defendant advised that all of her personal relationships have been physically abusive. She advised her boyfriend put his hands around her neck and put her up against the wall in front of her child. He also threw her clothes everywhere and broke the television. The defendant advised this incident occurred in 2013. She called the police but told them that he did not hit her because she was scared. She advised he was physically abusive to her on more occasions than she could count. She was never hospitalized as a result of the abuse. However, she suffered scratches, bruises, black eyes, bloody lips, and bloody noses. She indicated she never initiated the physical altercations but would defend herself. The defendant's mother was aware of her abusive relationships and indicated the defendant has personally never exhibited anger control issues.

96. The defendant has attempted suicide on at least five occasions. The defendant advised she attempted suicide for the first time when she was 13 years old. This attempt occurred after her father's suicide and after she was sexually abused. She indicated she cut her wrists and was found by her brother, Dakota. She was Baker Acted as a result and released within 24 hours without any follow-up treatment. This information was corroborated by her mother, who indicated she was aware the defendant attempted suicide but would be surprised to learn that she attempted suicide on any other occasion. The defendant was not hospitalized or Baker Acted as a result of her four most recent suicide attempts. The defendant indicated she attempted suicide at age 15 by cutting her wrists and arms. She advised she had been depressed after having her first child. She further advised her then boyfriend, Nicholas Valverde, found her. She indicated she attempted suicide again at age 16 or 17 by cutting her wrists and arms because she was depressed. No one found her. She indicated she attempted suicide again at age 18 by cutting her wrists and arms after getting into a physical altercation with her then boyfriend, Nicholas Valverde. No one found her. She attempted suicide again at age 24 by cutting her wrists and arms after she was having problems with her boyfriend.

97. She indicated she has never received counseling or been referred to a domestic violence program and would benefit from treatment.

**Substance Abuse**

98. The defendant began drinking alcohol in 2000 at age 12. She gradually increased her use over the years. From 2006 to 2008, she drank alcohol on a daily basis. She decreased her consumption after 2008 and drank four to five times per week at the time of her arrest.

99. The defendant began using marijuana in 2000 and used it daily until her arrest.

100.    The defendant began using cocaine in 2000 or 2001 and used it several times a week until approximately 2008.  The defendant advised she has not used any cocaine since 2008.

101.    The defendant began using LSD in 2001 and used it 20 times over a year period. She has not used any LSD since.

102.    The defendant began using MDMA in 2001 and used it almost daily until 2002. From 2002 to 2010, she sporadically used MDMA.  She has not used MDMA since 2010. The defendant has never received substance treatment and feels she would benefit from treatment. The defendant's mother verified her alcohol use but was unable to verify her drug use.

**Educational and Vocational Skills**

103.    The defendant indicated she withdrew from Jefferson Middle School in Palm Beach County, Florida in the seventh grade after becoming involved with Nicholas Valverde and getting pregnant. School records were requested and are pending receipt.

104.    The defendant advised she received her general equivalency diploma in August 2013, while incarcerated in the instant offense at the Palm Beach County Jail in West Palm Beach, Florida.

105.    The defendant has specialized training and skills in the hospitality industry including work as a server. She does not have any professional licenses.

**Employment Record**

106.    Since February 20, 2013, the defendant has remained incarcerated.

107.    The defendant declined to discuss her employment related to the instant offense upon the advice of defense counsel.  The defendant's mother advised she has provided financial assistance to the defendant on a few occasions. However, she indicated the defendant has been self-sufficient since she moved out of the family home at age 14.

108.    From November 2012 until her arrest, the defendant advised she babysit her brother Dakota Moore's children and her boyfriend's cousin's infant child in her own home for $20 to $30 per day. She estimated she earned a monthly net income of $200 to $300. This information was corroborated by her mother.

109.    From 2010 to 2012, the defendant advised she was primarily supported by her boyfriend.  She further advised she held a sign on the side of the road for a restaurant for $60 a day in cash for a six month period in 2010.

110. From 2009 to 2010, the defendant advised she was a server for Island Jack's Patio Bar and Grill in West Palm Beach, Florida. She worked full-time and earned a weekly net income of $400 to $500. She advised she was fired for insubordination. Employment records were requested and are pending receipt.

### Financial Condition: Ability to Pay

111. The following information was obtained by interviewing the defendant, examining financial records and by conducting an independent investigation through other sources as outlined in the analysis below.

### Analysis

112. The defendant advised she does not have any bank accounts or own any property. Florida Department of Highway Safety and Motor Vehicles records confirmed the defendant does not have any registered vehicles.

113. The defendant estimated she has medical debt totaling $25,000. According to Equifax Credit Information Services, the defendant does not have any outstanding debt or open lines of credit.

114. The defendant has remained incarcerated since February 20, 2013, and has no income or expenses.

115. The defendant advised she is not current with her income tax filings. Tax transcripts were requested from the Internal Revenue Service and are pending receipt.

116. Based on the defendant's present financial situation and considering she has three children and also faces a lengthy period of incarceration, it does not appear she has the ability to pay a fine in addition to any restitution which is mandatory.

## PART D. SENTENCING OPTIONS

### Custody

117. **Statutory Provisions:** As to Counts One and Two, the minimum term of imprisonment is 10 years and the maximum term is life. 18 U.S.C. § 1591(a)(1),(b)(2). As to Count Three, the term of imprisonment is any of term of years or life, 18 U.S.C. § 1594(c).

118. **Guideline Provisions:** Based upon a total offense level of 43 and a criminal history category of I, the guideline imprisonment range is life.

### Supervised Release

119. **Statutory Provisions:** As to each of Counts One through Three, the Court shall impose a term of supervised release of any term of years not less than five or life, 18 U.S.C. § 3583(k). Multiple terms of supervised release shall run concurrently, 18 U.S.C. § 3624(e).

120. **Guideline Provisions:** The guideline range for a term of supervised release is at least five years but may be up to life, § 5D1.2(b)(2),(c).

### Probation

121. **Statutory Provisions:** As to each of Counts One through Three, the defendant is not eligible for probation because the offenses are Class A felonies, 18 U.S.C. 3561(a)(1).

122. **Guideline Provisions:** The defendant is not eligible for probation because the instant offenses are Class A felonies, § 5B1.1(b)(1).

### Fines

123. **Statutory Provisions:** As to each of Counts One through Three, the maximum fine is $250,000, 18 U.S.C. § 3571(b)(3). A special assessment of $100 as to each count is mandatory, 18 U.S.C. § 3013.

124. **Guideline Provisions:** The fine range for this offense is from $25,000 to $250,000, § 5E1.2(c)(3).

125. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed, §5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts, dated June 24, 2014, provides the following monthly cost data:

|  | Bureau of Prisons Facilities | Community Correction Centers | Supervision by Probation Officer |
|---|---|---|---|
| Daily | $80.25 | $72.91 | $8.66 |
| Monthly | $2,440.97 | $2,217.73 | $263.50 |
| Annually | $29,291.62 | $26,612.76 | $3,162.03 |

### Restitution

126. **Statutory Provisions:** The Court shall order the defendant to make restitution to the victims of the offense, 18 U.S.C. § 3663A(a)(1). However, since the victims' losses are not yet ascertainable, the Court shall set a date for the final determination of the victims' losses, not to exceed 90 days after sentencing, pursuant to 18 U.S.C. § 3664(d)(5).

127. **Guideline Provisions:** Restitution shall be ordered, § 5E1.1.

## PART E. FACTORS THAT MAY WARRANT DEPARTURE

128. None

## PART F. IMPACT OF THE PLEA AGREEMENT

129. The defendant proceeded to trial in this case.

## PART G. RECOMMENDED SPECIAL CONDITIONS OF SUPERVISION

130. **Financial Disclosure Requirement:** The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

131. **No New Debt Restriction:** The defendant shall not apply for, solicit or incur any further debt, included but not limited to loans, lines of credit or credit card charges, either as a principal or cosigner, as an individual or through any corporate entity, without first obtaining written permission from the United States Probation Officer.

132. **Substance Abuse Treatment:** The defendant shall participate in an approved treatment program for drug and/or alcohol abuse and abide by all supplemental conditions of treatment. Participation may include inpatient/outpatient treatment. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

133. **Adam Walsh Act Search Condition:** The defendant shall submit to the U.S. Probation Officer conducting periodic unannounced searches of the defendant's person, property, house, residence, vehicles, papers, computer(s), other electronic communication or data storage devices or media, include retrieval and copying of all data from the computer(s) and any internal or external peripherals and effects at any time, with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release.  The search may include the retrieval and copying of all data from the computer(s) and any internal or external peripherals to ensure compliance with other supervision conditions and/or removal of such equipment for the purpose of conducting a more thorough inspection; and to have installed on the defendant's computer(s), at the defendant's expense, any hardware or software systems to monitor the defendant's computer use.

134. **No Contact with Minors:** The defendant shall have no personal, mail, telephone, or computer contact with children/minors under the age of 18 or with the victims.

135. **No Contact with Minors in Employment:** The defendant shall not be employed in a job requiring contact with children under the age of 18 or with the victims.

136. **No Involvement in Youth Organizations:** The defendant shall not be involved in any children's or youth organization.

137. **Sex Offender Registration:** The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.

138. **Sex Offender Treatment:** The defendant shall participate in a sex offender treatment program to include psychological testing and polygraph examination. Participation may include inpatient/outpatient treatment, if deemed necessary by the treatment provider.  The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

139. **Mental Health Treatment:** The defendant shall participate in an approved inpatient/outpatient mental health treatment program.   The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

Respectfully Submitted,

by:   _____
      Frances Weisberg
      U.S. Probation Officer

Reviewed and approved:

_____
For Virginia Cataldo
Supervising U.S. Probation Officer